IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No. 09-cv-00295-RBJ-MJW

GLENN H. KEMP,

    Plaintiff,

v.

BRIAN WEBSTER, in his individual capacity,
GATBEL CHAMJOCK, in his individual capacity,
CHRIS WADE, in his individual capacity,
TRACY TARVER, in his individual capacity,
CHERYL SMITH, in her individual capacity as Chief Medical Officer of the Colorado Department of Corrections ("CDOC"),
DR. GARY FORTUNATO, in his individual capacity as physician at SCF,
JOANN STOCK, PA, in her individual capacity as a Physician's Assistant working at SCF,
BEVERLY DOWIS, in her individual and official capacity as Health Service Administrator for SCF,

    Defendants.

---

## ORDER

---

This case comes before the Court based upon Plaintiff Glenn Kemp's claims that defendants violated the Eight Amendment of the United States Constitution while Mr. Kemp was confined at Sterling Correctional Facility. Defendants now seek summary judgment [Docket #134].

**Facts**[1]

Auto Accident

---

[1] Many of these facts are disputed by defendants. However, since this is a motion for summary judgment, all facts are presented in a light most favorable to plaintiff as the non-moving party.

Plaintiff Glenn Kemp is an inmate at Sterling Correctional Facility ("Sterling"). Defendants Chris Wade and Tracy Tarver are corrections officers at Sterling. On February 5, 2008, Mr. Wade and Mr. Tarver were assigned to transport Mr. Kemp to a medical appointment in Denver. There was ice and snow on the roads that day, and Mr. Kemp was nervous about the weather and offered to miss his medical appointment. (Kemp. Aff. ¶¶ 8-9) A second inmate Greg Savajian, was also transported with Mr. Kemp. (*Id.* at ¶ 12) For the drive, Mr. Kemp was fitted with leg chains, a waste chain, handcuffs, and a "black box." (Kemp Aff. ¶ 13) A "black box" is a device that further immobilizes a prisoner's hands. (*Id.*) After being loaded into the van, Mr. Kemp asked Mr. Tarver to apply his seatbelt, but Mr. Tarver refused. (*Id.* at ¶ 15) According to Mr. Kemp, during the drive Mr. Wade was erratically changing lanes, fishtailing, and sliding on the snowy highway. (*Id.* at ¶ 16). In response to the driving, Mr. Tarver yelled at Mr. Wade and called him an "idiot" several times." (*Id.* at ¶ 17) In Denver, the van driven by Mr. Wade crashed into a car that was stopped at the bottom of a hill. (*Id.* at ¶ 21). The crash led to a collision with four other vehicles. (*Id.* at ¶ 22). Mr. Wade was cited for the accident. (*Id.* at 26).

Medical Care Related to Auto Accident

The day of the accident, Mr. Kemp did not feel any pain. However, when he woke up the next morning he was experiencing significant pain in his lower back and leg. (*Id.* at 28-29). That day, February 6, 2008, Mr. Kemp saw Mr. Webster, a physician assistant. (Webster Aff. ¶¶ 1-3). At the appointment, Mr. Webster found para-lumbar muscle tenderness and prescribed Motrin. (*Id.* at ¶ 3) Following that appointment, Mr. Kemp was still in pain and complained to Mr. Webster that the Motrin was not sufficient. (Kemp Aff. ¶ 34). Mr. Kemp again saw Mr. Webster on February 12, 2008. (Webster Aff. ¶ 4) Mr. Kemp was still experiencing pain in his

back and leg as well as numbness. (Kemp Aff. ¶ 35). Mr. Webster prescribed Tylenol and gave Mr. Kemp back exercises to do but did not order additional diagnostic testing. (*Id.* at ¶ 36.)

Following that appointment, Mr. Kemp sent several "kites" complaining of on-going pain and asking for follow-up care. (*Id.* at ¶ 38). Kites allow offenders to send written requests to be seen by healthcare providers at Sterling. (*Id.*) Mr. Kemp also filed a grievance against Mr. Webster asking to be seen by a "qualified physician and/or neurologist." (*Id.* at ¶ 41).

On March 3, 2008 Mr. Kemp saw Mr. Chamjock, another physician assistant at Sterling. Mr. Chamjock did a physical examination, prescribed a muscle relaxant, and ordered an x-ray. (*Id.* at ¶¶ 43-44) Mr. Kemp saw Mr. Webster again on April 10, 2008. (*Id.* at ¶ 47) Mr. Webster submitted a request for approval of an electromyography ("EMG"). (Ex. 1-F) The EMG was denied, but an MRI was approved. (*Id.*) The MRI was performed on April 28, 2008 and showed a pinched nerve. (Kemp Aff. at ¶ 48) The results of the MRI were faxed to Sterling on April 30, 2008. On May 21, 2008 Mr. Kemp sent a kite to Mr. Webster requesting an appointment to discuss continued pain. (*Id.* at ¶ 50) Mr. Kemp saw Mr. Chomjock on June 3, 2008 and discussed his continued pain. Mr. Kemp sent another kite to Mr. Webster on June 17, 2008 discussing his back and leg pain and muscle deterioration. (*Id.* at ¶ 53)

Mr. Kemp saw a neurologist on September 10, 2008 and an orthopedic doctor on September 19, 2008. (*Id.* at ¶ 55-56) The orthopedic doctor ordered a second MRI and an EMG. The second MRI was performed on December 11, 2008. (*Id.* at ¶57). The MRI results were consistent with the first MRI. (*Id.*) On January 25, 2009 Mr. Kemp filed a grievance against Mr. Webster, alleging that Mr. Webster failed to forward the MRI results to the orthopedic doctor which delayed Mr. Kemp's care. *Id.* at ¶ 62. Mr. Kemp did not get a response from Mr. Webster until April 8, 2009 when he was told that the follow-up appointment had been ordered. (*Id.* at ¶

64)  Mr. Webster left Sterling on April 30, 2009.  (Webster Aff. ¶ 12)  After this time, Mr. Kemp continued to been seen at an orthopedic clinic and by a neurologist.

Medical Care Related to Mr. Kemp's Prostate

In 2008 Mr. Kemp began complaining to Mr. Webster and Mr. Chomjock about frequent urination and urinary incontinence. Medical records from April 10, 2008 mention urinary incontinence. (Ex. 1-E) On August 21, 2008 Mr. Webster performed a digital rectal exam which revealed early benign prostate hypertrophy. (Webster Aff. at ¶ 9) Mr. Kemp was prescribed Hytrin, but he did not tolerate it well, so its use was discontinued. (Kemp Aff. at ¶ 71) In March 2009 Mr. Kemp was still complaining of urinary incontinence and asked Mr. Chomjock for urinary briefs because he was soiling himself. (*Id.* at ¶ 73) Mr. Chomjock also prescribed Indocin. (Chomjock Aff. at ¶ 13). Mr. Kemp did not see an urologist until February 2010. (*Id.* at ¶ 74) In March of 2010 Mr. Kemp was diagnosed with a serious prostate infection that required two months of antibiotics. (*Id.* at ¶ 78) Suspecting prostate cancer, in July of 2010 the urologist requested a biopsy of Mr. Kemp's prostate. (*Id.* at ¶ 80) Following that appointment, Mr. Kemp did not hear anything about a biopsy. (*Id.* at ¶ 81.) Mr. Kemp began sending kites and other requests for the biopsy. (*Id.*) Mr. Kemp also sent a letter to Beverly Dowis, the Health Services Administrator at Sterling, in September explaining the need for a biopsy. (*Id.*) However, Mr. Kemp was not scheduled for a biopsy until October of 2010. (Ex. I-20) That biopsy and a subsequent biopsy were cancelled because Mr. Kemp was not properly prepped for the procedure. (Kemp Aff. at ¶¶ 83-84) Mr. Kemp did not get a prostate biopsy until January 2011. (Ex. I-21). The biopsy showed abnormal findings and it was requested that Mr. Kemp get a follow-up biopsy. (Kemp. Aff. ¶ 86). Mr. Kemp got a second biopsy in April 2011. (*Id.*) Mr. Kemp was diagnosed with prostate cancer in 2012.

**Standard**

Generally, summary judgment is appropriate when "the movant shows that there is no genuine dispute to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). Because the defendants assert a qualified immunity defense the summary judgment standard is subject to a "somewhat different analysis from other summary judgment rulings." *Steffey v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006). The qualified immunity doctrine "shields government officials performing discretionary functions from liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Toevs v. Reid*, 646 F.3d 752, 755 (10th Cir. 2011) (internal citations omitted). To overcome summary judgment based on qualified immunity, the plaintiff "must show that the defendant's actions violated a specific statutory or constitutional right, and that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue." *Steffey*, 461 F.3d at 1221.

This standard requires a two pronged analysis: "First a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second, the court must decide whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009). The first prong requires that the Court determine whether the plaintiff "sufficiently asserted the violation of a constitutional right." *Lighton v. University of Utah,* 209 F.3d 1213, 1221 (10th Cir. 2000). The plaintiff "must do more than abstractly identify an established right, but must specifically identify the right and conduct . . . which violated that right." *Id.* A right is clearly established if it would have been "clear to a reasonable officer that his conduct was unlawful under the circumstances presented." *Id.; See also Saucier v. Katz*, 533 U.S. 194, 202 (2001). The plaintiff must satisfy both prongs to defeat a claim of qualified immunity. *Id.*

If a plaintiff succeeds in showing violation of a constitutional right, then defendants bear the burden of showing that there are no material issues of fact that would defeat their claim of qualified immunity. *Lighton,* 209 F.3d at 1221.

**Conclusions**

Mr. Kemp alleges that his Eighth Amendment rights were violated in three ways: (1) Mr. Kemp was not seat belted during transport and the van was driven recklessly; (2) Mr. Kemp did not receive adequate medical attention for injuries sustained in the van accident during the transport; and (3) Mr. Kemp did not receive adequate medical treatment for a prostate condition. Each of these claims will be addressed below.

Failure to Seatbelt

Mr. Kemp argues that his rights were violated when he was transported by Mr. Tarver and Mr. Wade without a seatbelt. Because the defendants have raised the defense of qualified immunity, Mr. Kemp must show that the defendants' actions violated a specific constitutional right, and that the constitutional right the defendants allegedly violated was clearly established at the time of the conduct at issue. *Steffey*, 461 F.3d at 1221.

Thus, the first inquiry is whether the defendants' failure to seatbelt Mr. Kemp rises to the level of a constitutional violation. Inmates must be "furnished with the basic human needs, one of which is reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). Accordingly, "[a] prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).

The test for deliberate indifference has both an objective and subjective component. *Id.* at 834. The objective component is met when a plaintiff alleges a deprivation that is "sufficiently serious." *Id.* This has been described as "conditions posing a substantial risk of

serious harm," *Smith v. Cummings,* 445 F.3d 1254, 1258 (10th Cir. 2006), an "excessive risk to inmate health or safety," *Farmer,* 511 U.S. at 837, and conditions "sure or very likely to cause serious illness and needless suffering," *Helling,* 509 U.S. at 33.  The subjective component refers to the defendant's mindset.  "'[D]eliberate indifference describes a state of mind more blameworthy than negligence,' but 'something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'"  *Dexter v. Ford Motor Co.*, 92 Fed. App'x 637, 640 (quoting *Farmer*, 511 U.S. at 835) (internal citations omitted).  A prison official is only liable if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 537.  This standard has been equated to recklessness by the Tenth Circuit.  *Self v. Crum,* 439 F.3d 1227, 1231 (10th Cir. 2006).

    First, the Court examines the objective component, whether failure to seatbelt an inmate poses a substantial risk of serious harm.  The Tenth Circuit has looked at this issue once before.  In *Dexter v. Ford Motor Co.*, the court considered whether failure to seatbelt an inmate was by itself enough to rise to a violation of the Eighth Amendment.  92 Fed App'x 637, 640-44.  In *Dexter*, prisoners were being transported in a fifteen passenger van while handcuffed and shackled but not seatbelted.  The prisoners were injured when the van hit the median and rolled.  The *Dexter* court clarified that although there were facts suggesting reckless driving, the plaintiff's claim relied solely on failure to seatbelt, and the court was not analyzing failure to seatbelt combined with reckless driving.  *Id.* at 640.  The court determined that failure to seatbelt alone was not enough to rise to the level of an Eighth Amendment violation.  *Id.* at 641.  The court explained:

> The connection between failure to seatbelt and the risk of serious injury . . . is insufficient for purposes of constitutional analysis. The risk of a motor vehicle accident is dependent upon a host of factors unrelated to the use of seatbelts, *viz.,* vehicular condition, time of day, traffic, signage, warning lights, emergency circumstances, weather, road conditions, and the conduct of other drivers. The eventuality of an accident is not hastened or avoided by whether an inmate is seatbelted. While the severity of harm should an accident occur may be exacerbated by the failure to seatbelt, it is not directly occasioned by it and the other variables must be included in the risk equation.

*Id.* at 641.

The court further explained a prisoner must show that "the risk of which he complains is not one that today's society chooses to tolerate." *Id.* at 642. The court looked at current state laws in the Tenth Circuit and found that there was not clear consensus that passengers in a vehicle must be seatbelted. *Id.* Accordingly, the court determined that failure to seatbelt a passenger was not a risk which society refused to tolerate. *Id.*

The court distinguished *Dexter* from *Pendelton v. Schroeder,* No. C98 0791 FMS, 1998 WL 273000 (N.D. Cal. May 22, 1998), a case in which the complaint "alleged an Eighth Amendment violation based on the combined factors of failure to seatbelt and a prison practice to transport prisoners in vans arranged convoy-style between other law enforcement vehicles." *Dexter,* 92 Fed. App'x at 642 n. 7. The court explained that in *Pendelton* the complaint was based on more than failure to seatbelt alone. *Id.*

The United States District Court for the District of New Mexico also examined this issue. In *Barela v. Romero*, the court looked at facts very similar to *Dexter,* where an inmate was injured while being transported without a seatbelt as part of a convoy. *Barela v. Romero,* No. CIVIL06-41 JBDJS, 2007 WL 2219441, *7 (D.N.M. May 10, 2007). In *Barela* the transport van was driving at high speeds and stopping erratically. *Id.* The court distinguished this case from *Dexter* and held that the plaintiff had satisfied the requirements to state a claim of an Eighth

Amendment violation because he pled his rights were violated by the combination of reckless driving and no seatbelt. *Id.*

This case is likewise distinguishable from *Dexter*. Unlike in *Dexter*, in this case, Mr. Kemp alleges that his Eighth Amendment rights were violated by a combination of factors when Mr. Wade and Mr. Tarver failed to seatbelt him on a day when roads were snow packed and icy. (Kemp. Aff. ¶ 9). Further, Mr. Kemp argues that Mr. Wade was driving recklessly, and Mr. Tarver failed to stop him. Mr. Kemp offers in an affidavit that Mr. Wade was making erratic lane changes, following too closely, and fishtailing. (Kemp Aff. at ¶ 16). Mr. Kemp alleges that Mr. Tarver yelled at Mr. Wade, calling him an "idiot" because of his driving. (*Id.* at ¶ 17.) Once in Denver, the van hit another car causing a five car accident. (*Id.* at ¶¶21-22). Mr. Wade received a traffic citation for following too closely and causing the accident. (*Id.* at ¶¶ 25-26).[2]

Unlike in *Dexter* where the court concluded that "the eventuality of an accident is not hastened or avoided by whether an inmate is seatbelted," *Dexter,* 92 F. App'x at 641, the likelihood of an accident is increased by poor road conditions, driving too fast for conditions, erratic lane changes, and following too closely. Unfortunately for all involved, these behaviors did in fact lead to an accident. And as the Tenth Circuit acknowledged the harm from an accident can be exacerbated by the failure to seatbelt. *Id.*

Further, unlike failing to seatbelt a passenger, driving recklessly is a risk society has chosen not to accept. All states in the Tenth Circuit have laws that forbid reckless or careless driving. Colo. Stat. § 42-4-528; Kan. Stat. Ann. § 8-1566; N.M. Stat. Ann. § 66-8-113; Okla. Stat. tit. 47 § 11-901; Utah Code Ann. § 41-6a-528; Wyo. Stat. Ann. § 31-5-236. Anyone who has driven Colorado roads on a snowy day knows that driving too close to another vehicle is

---

[2] I note this for purposes of the summary judgment motion without suggesting that the citation is admissible. Defendant's motion #158 regarding this issue is not ripe.

dangerous. Accordingly, Mr. Kemp has satisfied the objective component of an Eighth Amendment violation by showing there was substantial risk of serious harm.

Next, Mr. Kemp must show the subjective component of deliberate indifference, that Mr. Wade and Mr. Tarver knew of the excessive risk and ignored it. Mr. Kemp has proffered sufficient facts to show that the defendants knew that they were subjecting Mr. Kemp to an excessive risk. First, Mr. Kemp suggested to the defendants not driving that day because of the icy roads. (Kemp Aff. at ¶ 12). Also, Mr. Kemp has provided evidence that he asked to be seatbelted. (*Id.*). Further, in his affidavit, Mr. Kemp provided that Mr. Tarver called Mr. Wade an "idiot" because of his erratic driving. (*Id.* at ¶ 17). All of these warnings suggest that the officers were aware or should have been aware the Mr. Wade's driving combined with the road conditions and lack of seatbelts created a dangerous condition. This shows that the defendants acted with recklessness, and therefore, Mr. Kemp satisfies the subjective test for deliberate indifference.

"If, and only if, the court finds a violation of a constitutional right, the next, sequential step is to ask whether the right was clearly established . . . in the specific context of the case." *Scott v. Harris,* 550 U.S. 372, 377 (2007) (internal quotations omitted). A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. 194, 202 (2001). "Although the very action in question does not have to have previously been held unlawful, 'in the light of pre-existing law the unlawfulness must be apparent.'" *Albright v. Rodriquez,* 51 F.3d 1531, 1535 (10th Cir. 1995) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as

the plaintiff maintains." *Medina v. City and Cnty. of Denver,* 960 F.2d 1493, 1498 (10th Cir. 1992).

Neither the Tenth Circuit nor the Supreme Court has examined whether a failure to seatbelt combined with reckless driving and snowy weather constitutes cruel and unusual punishment. The closest the Tenth Circuit came was in *Dexter* when the court looked at failure to seatbelt alone. However, the Supreme Court and the Tenth Circuit have made it explicitly clear that subjecting inmates to an unreasonable and substantial risk of harm violates the Eighth Amendment. *Farmer,* 511 U.S. at 847. In articulating the deliberate indifference standard, the Supreme Court has established that inmates are owed a standard of reasonable safety. *Helling,* 509 U.S. at 33.

The Eighth Circuit addressed this question in *Brown v. Fortner*, 518 F.3d 552 (8th Cir. 2008). In *Brown* the court determined that the right to not be driven recklessly without a seatbelt was clearly established because corrections employees had "fair warning" although there were no published cases in that circuit "directly addressing deliberate indifference in the context of prisoner transportation." *Id.* at 561. The Eight Circuit did have a case with very similar facts that was unpublished. However, the court reasoned that "even discounting [the case's] significance because it was unpublished, 'officials can still be on notice that their conduct violated established law even in novel factual circumstances.'" *Id.* (quoting *Hope v. Pelzer,* 536 U.S. 730, 741 (2002)). The court explained that there were other cases addressing deliberate indifference to the safety of prisoners which made the right clearly established. *Id.* at 561-62.

Similar to the Eighth Circuit's reasoning, Mr. Wade and Mr. Tarver had "fair warning" that failing to seatbelt an inmate combined with driving recklessly on a snowy day would be deliberate indifference to a substantial risk of harm. *Dexter* clearly explained that it was only

looking at failure to seatbelt alone and was therefore distinguishing the case from *Pendleton* where a federal district court did find that reckless driving combined with failure to seatbelt was deliberate indifference. *Dexter,* 92 F. App'x at 640-42. Further, the *Dexter* court explained that it was significant in reaching its decision that failure to seatbelt does not make an accident more likely and listed factors that increase the likelihood of an accident, including weather and road conditions. *Id.* at 641. Thus, the *Dexter* opinion suggests that driving decisions that make an accident more likely are also more likely to amount to deliberate indifference.

Even discounting *Dexter's* significance because it was an unpublished case, the law describing deliberate indifference is clear in the Tenth Circuit. Deliberate indifference requires knowingly subjecting an inmate to a sufficiently serious risk of harm. *Farmer,* 511 U.S. at 834. This standard has been equated to recklessness in the Tenth Circuit. *Self,* 439 F.3d at 1231. Accordingly, it was clearly established that prison employees could not subject an inmate to a substantial risk of serious harm. Transporting a cuffed and shackled inmate, unrestrained, in a vehicle that is erratically changing lanes, fishtailing, and following too closely is clearly reckless. Defendants should have been on notice that this was reckless and therefore in violation of the Eighth Amendment. Thus, the right is clearly established.

Because Mr. Kemp has shown that, taking the facts in the light most favorable to him as the non-moving party, his constitutional rights were violated and those rights were clearly established, Mr. Wade and Mr. Tarver are not entitled to summary judgment as a result of qualified immunity.

Medical Attention

Like inmate safety, a "prison official's deliberate indifference to an inmate's serious medical needs violates the Eight Amendment." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th

Cir. 2000). Deliberate indifference in the context of medical treatment also has an objective and subjective component. *Id.* The objective component requires that the deprivation be "sufficiently serious." *Id.* "A medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (quoting *Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir. 1999)). The subjective component is met when a prison official "knows of and disregards an excessive risk to inmate health or safety." *Farmer,* 511 U.S. at 837.

*Treatment of Back and Leg Pain*

Following the car accident, Mr. Kemp began to experience pain and numbness in his back and legs and muscle deterioration. Mr. Kemp argues that he did not receive adequate treatment for this condition and this deprivation of medical care rose to the level of an Eighth Amendment violation. Following the framework laid out above, to be an Eight Amendment violation, the medical need must have been sufficiently serious: either diagnosed as mandating treatment from a physician or so obvious that even a lay person would recognize the necessity for medical attention. *Sealock*, 218 F.3d at 1209.

The day after the car accident Mr. Webster examined Mr. Kemp. Mr. Webster determined that there was muscle tenderness and prescribed Motrin. (Webster Aff. at ¶ 3) Following that Mr. Webster saw Mr. Kemp on February 12, 2008 and diagnosed him with Lumbago, gave Mr. Kemp back exercises to do and told him to walk more. (*Id.* at ¶ 4) Following an MRI on April 28, 2008, Mr. Webster determined that Mr. Kemp was suffering from a disk protrusion. (*Id.* at ¶ 6). Based on his experience, Mr. Webster believed that this would heal on its own in a few months. (*Id.*). A few months later when Mr. Kemp was still suffering, Mr. Kemp saw both a neurosurgeon and an orthopedic doctor.

Under these facts, Mr. Kemp was not diagnosed with something needing immediate medical attention. First, Mr. Webster believed it was muscle tenderness and proscribed Motrin. When Mr. Webster later determined that the pain was caused by Lumbago, he prescribed back exercises. Even after a MRI showed a disk protrusion, it was in Mr. Webster's medical opinion that this would heal on its own in several months. Mr. Kemp has not provided any evidence to suggest that those diagnoses were unreasonable.

Mr. Kemp argues that his pain was so serious that even a lay person would recognize his need for medical attention. In *Oxedine* the Tenth Circuit found that an inmate's medical needs were so severe that even a lay person would know. *Oxedine v. Kaplan*, 241 F.3d 1272 (10th Cir. 2001). In that case, an inmate's finger had been severed and reattached. After it was reattached it began turning black and pieces of it were falling off. Despite this, the doctor failed to seek help from a specialist to save the decaying finger. In that case, it was clear that any lay man would know that the inmate needed medical attention and that the medical attention he was receiving was clearly not working — the inmate's finger was black and falling off. In Mr. Kemp's case, it is not nearly so clear. Mr. Kemp was experiencing back and leg pain and numbness and muscle deterioration. But, he had also been given pain killers and muscle relaxers, been shown exercises to do, and underwent diagnostic treatments. It was not clear to a lay person that he needed additional medical treatment; it was reasonable for a lay person to think that perhaps he just needed more time to heal. Further, when those treatments failed, Mr. Kemp was able to see a neurosurgeon and an orthopedic doctor.

The Court acknowledges that it was understandably frustrating to Mr. Kemp when Mr. Webster failed to answer his kites for follow up appointments and prescription refills. That it took three months for Mr. Kemp to get the follow-up MRI that the neurologist ordered must have

also been exasperating. However, these shortcomings in care do not rise to constitutional violations. "[D]elay in medical care only constitutes an Eight Amendment violation where the plaintiff can show that the delay resulted in substantial harm." *Oxedine,* 241 F.3d at 1276 (quoting *Sealock*, 218 F.3d at 1210). Mr. Kemp has not shown that delays in treatment resulted in substantial harm. When Mr. Kemp finally received his second MRI, the results were the same as the first MRI, suggesting that the three month delay in getting the MRI did not cause additional harm.

Because Mr. Kemp's back and leg pain and numbness were not "sufficiently serious," Mr. Kemp cannot meet the objective test for deliberate indifference required for an Eighth Amendment violation. Because there was no Eighth Amendment violation, defendants Webster, Chamjock, and Dowis have qualified immunity for this claim and summary judgment is granted in their favor.

*Prostate Treatment*

Mr. Kemp's prostate condition was "sufficiently serious." Early on it appeared that Mr. Kemp had only early benign prostate hypertrophy. However, by March of 2012 Mr. Kemp was diagnosed with a serious prostate infection requiring two months of antibiotics and in 2012 he was diagnosed with prostate cancer. An infection serious enough to require two months of antibiotics is a condition that has been diagnosed by a physician as demanding medical treatment. Accordingly, it was a sufficiently serious medical condition to meet the objective prong of an Eighth Amendment complaint.

Next, the subjective part of the test requires the defendant to know of and disregard a serious risk to inmate health or safety. In his affidavit Mr. Kemp says that he complained frequently to both Mr. Webster and Chomjock about his urinary incontinence. As early as April

2008 urinary incontinence was mentioned in Mr. Kemp's medical records. In August 2008 Mr. Webster performed a digital rectal exam and determined that Mr. Kemp was suffering from early benign prostate hypertrophy. (Webster Aff. at ¶ 9). Mr. Webster explains that this is common in men over 50. (*Id.*) Mr. Webster prescribed Hytrin. (*Id.*) Mr. Webster said in November he discontinued use of the Hytrin and ordered a Prostate Specific Antigen test ("PSA") test for Mr. Kemp's prostate. (*Id.* at ¶ 11). Mr. Webster did not see Mr. Kemp again before he left Sterling in April 2009. (*Id.* at 12). In March 2009 Webster saw Mr. Chamjock and requested urinary briefs because of his incontinence. (Chomjock Aff. at ¶ 13). Mr. Chamjock denied the request, and instead determined that Mr. Kemp should discuss the issue with his primary care physician, Dr. Fortunato. (*Id.*) A prescription for Indocin was ordered as well as a follow-up appointment with Dr. Fortunato. (*Id.*)

This evidence does not show the Mr. Webster or Mr. Chamjock knowingly disregarded a serious risk to Mr. Kemp's health. Rather, Mr. Webster and Mr. Chomjock sought to diagnose and treat the problem. Mr. Webster performed a digital rectal exam and both ordered prescriptions to try to treat the problem. Additionally, Mr. Chamjock ordered that Mr. Kemp see his primary care physician. "[A] medical professional may fail to treat a serious medical condition properly. Where this sort of conduct is alleged, the medical professional has available the defense that he was merely negligent in diagnosing or treating the medical condition, rather than deliberately indifferent." *Sealock*, 218 F.3d at 1211. While Mr. Webster and Mr. Chamjock may have misdiagnosed the severity of Mr. Kemp's prostate issues, the evidence does not show that they were deliberately indifferent. Accordingly, Mr. Webster and Mr. Chamjock are entitled to qualified immunity.

Although Mr. Webster and Mr. Chamjock attempted to diagnose and treat Mr. Kemp's prostate condition, there was a serious mishandling of the treatment. After Mr. Chamjock referred Mr. Kemp to Dr. Fortunato in March 2009, Mr. Kemp did not see an urologist until February 2010. In late February 2010 the urologist, Dr. Goldwater, told Mr. Kemp that he thought that Mr. Kemp had prostate cancer and ordered additional testing. (Kemp Aff. at ¶ 76) The testing revealed a serious infection that required treatment with antibiotics. After treatment, in May 2010 Mr. Kemp was again tested and his PSA levels were high. Mr. Kemp saw an urologist in July 2010 where he was told he would need a scope of his bladder and a biopsy. (*Id.* at ¶78) However, two months later Mr. Kemp still did not hear anything about those appointments. After sending several kites and a letter to Ms. Dowis, Mr. Kemp was scheduled for a biopsy in October 2010. Unfortunately, Mr. Kemp was not properly prepped for his biopsy and so it had to be rescheduled. This happened a second time. As a result, a biopsy was not performed until January 2011, ten months after Mr. Kemp was told he likely had cancer. After that biopsy, a second biopsy was requested. The second biopsy did not happen until April 2011. Thus, it took over a year from the time Mr. Kemp was told that he likely had prostate cancer until the necessary diagnostic tests were performed.

Mr. Kemp argues that Ms. Dowis is in charge of overseeing the clinical staff and ensuring that inmates get adequate care. However, Ms. Dowis argues that she does not schedule appointments or arrange for procedures with specialists. In a previous case, this court also examined Ms. Dowis's responsibilities.

> Ms. Dowis testified, and her job description confirmed, that as the facility's Health Services Administrator she has operational and supervisory oversight over the clinical staff. Her duties include preserving inmates' rights to legally mandated healthcare. Among other things she supervises the offender grievance process with respect to medical issues. Essentially, Ms. Dowis was the supervisor in charge of ensuring, or at

> least exercising her best efforts to ensure, that inmates receive necessary and appropriate medical care.

*Self v. Milyard,* No. 11-cv-00813-RBJ-CBS, 2012 U.S. Dist. LEXIS 129263 (D. Colo. July 31, 2012).

Mr. Kemp says that he sent Ms. Dowis a letter detailing his difficulty getting a biopsy. In that case, Ms. Dowis would have known about his delays in treatment and yet not ensured he got the care he needed. Further, previous trial testimony shows that Ms. Dowis knew that there were flaws in the system, that appointments with outside providers could fall into a "black hole" further delaying treatment. (Transcript of Trial at 95:6-96:4, *Self v. Milyard,* No. 11-cv-00813-RBJ-CBS (D. Colo. July 31, 2012, Ex. 2).

Because there is a factual dispute about what Ms. Dowis's job responsibilities were, at the summary judgment stage all facts must be read in a light most favorable to Mr. Kemp. Thus, it is reasonable to understand that it was Ms. Dowis's responsibility to make sure Mr. Kemp was getting treatment for his prostate and that Ms. Dowis knew or should have known that Mr. Kemp was not getting the care he needed and yet did not intervene. This is deliberate indifference.

Ms. Dowis argues that she cannot be liable because she was only a supervisor, that there was no personal participation. While it is true that a complaint must allege an affirmative link between a constitutional violation and the individual's participation in the violation, *Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1156 (10th Cir. 2001), that does not shield Ms. Dowis from responsibility. Mr. Kemp alleges that it was Ms. Dowis's job to ensure that all inmates received constitutionally mandated health care. Thus, if Mr. Kemp did not get the services required by law, it was not a failure of Ms. Dowis to adequately supervise others, but rather a failure of Ms. Dowis to adequately perform the tasks of her job, thereby establishing the affirmative link.

Because Mr. Kemp has provided evidence to show both the objective and subjective prongs of deliberate indifference to establish an Eighth Amendment violation, he must also show that the right was clearly established. "Elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). The right for prisoners to receive adequate medical care is clearly established. Ms. Dowis argues that this court recently held, "an inmate's right to have prison officials make a follow-up appointment with an outside specialist, as requested by the specialist in his records, notwithstanding the specialist's failure to initiate the request directly with the managed care provider, was not a clearly established right . . ." *Self,* 2012 U.S. Dist. LEXIS 129263 at *27. However, that is not what this case is about. In this case, Mr. Kemp had a clearly established right to get treatment for his prostate cancer without unnecessary delays. Accordingly, Ms. Dowis is not entitled to qualified immunity and thus her request for summary judgment is denied.

**Order**

1. Defendant Tarver and Defendant Wade's motion for summary judgment is DENIED.
2. Defendant Webster and Defendant Chomjock's motion for summary judgment is GRANTED.
3. Defendant Dowis's motion for summary judgment is DENIED.

DATED this 16th day of October, 2012.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge